UNITED STATES of America

v.

Sidney SALZMANN, Defendant.

No. 72–CR–740.

United States District Court,
E. D. New York.

July 16, 1976.

See also, D.C., 386 F.Supp. 734.

David G. Trager, U. S. Atty., E. D. of N. Y., Thomas R. Maher, Asst. U. S. Atty., Brooklyn, N. Y., for the United States.

Louis Lusky, New York City, for defendant.

### MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This is but one of tens of thousands of cases carried in the limbo of federal courts' fugitive files. Young men indicted for failure to carry out their obligations under the Selective Service Laws during the Vietnam Conflict are scattered across the face of the earth—like abandoned weapons corroding and useless to this country. The defendants refuse to cooperate with the government by returning to be tried. The prosecution does nothing to compel their presence. The government, like so many of us, would prefer to forget Vietnam and its legacy. Since, however, the cases on this court's docket represent real people whose present lives are vitally affected by these pending criminal cases, courts may not indulge in the luxury of disregarding the issue when it is properly raised by motion, as it now has been.

The question before us is whether, as to this defendant in this case, the rules re-

specting speedy trials have been violated. For the reasons indicated below we hold that a speedy trial for this defendant is no longer possible and that, accordingly, the indictment must be dismissed.

In 1972, the government indicted Sidney Salzmann for failure to appear for a pre-induction physical and for induction. 50 U.S.C. App. 462(a). Salzmann, a resident of Israel, had conducted a substantial correspondence with the government prior to the indictment in an effort to avoid just such an event. He had informed the government repeatedly that financial constraints prevented him from making the journeys for the physical or for induction. Instead of informing him of travel assistance available to him, the government treated him as a draft evader, indicted him, and allowed the indictment to lie fallow for four years.

The passivity that has characterized treatment of Salzmann requires analysis of whether the government has failed to make the effort to procure his presence for trial required by the various Speedy Trial Plans in effect since 1971 and by the Speedy Trial Clause of the Sixth Amendment. This inquiry has become crucial since, due to the delay in bringing Mr. Salzmann to trial, the United States Attorney's Office is no longer able to afford him two alternatives to prosecution that it has offered many others accused of draft evasion: the institution of an all-volunteer army has made submission to induction impossible and the termination of the amnesty program has removed community service work as an alternative.

## I. FACTS

Sidney Salzmann faithfully kept the draft board informed of his status and residence from the time he registered by mail for the draft in 1964 while he was temporarily residing in Israel. He advised the board of his return to the United States in 1965, his enrollment at Queens College in New York, his marriage, and his entry into rabbinical studies in 1969. Accordingly, in 1969 he was classified IV–D as a divinity student, a deferment that would have ripened into a draft exemption had he completed his studies. In December of 1969 he advised the local draft board that he had moved to Jerusalem, Israel. As a result, he was classified I–A, and ordered to report for a physical examination on May 3, 1970, in Jamaica, New York, or at an army facility outside the United States. In response to an inquiry by Mr. Salzmann, the board gave him the option of reporting to Livorno, Italy on May 27, 1970, for pre-induction processing. On April 30, 1970, Mr. Salzmann wrote the Local Board to explain why he had discontinued his rabbinical work and to inquire whether he would still be eligible for a IV–D classification if he resumed his studies. He requested a speedy reply before his scheduled physical in Italy. He was advised to have a school submit verification of his student status and to report for the physical examination as scheduled.

Mr. Salzmann did not report for the physical examination in Italy and he informed the local board that his failure "to show up at the physical was . . . due to the shortage on my part of the necessary Dollars required to undertake such a trip." His letter elaborated on his financial inability in some detail. Nevertheless, the board ordered him to report for induction at Fort Hamilton, New York on January 18, 1971. In early January Mr. Salzmann informed the board that he still did not have adequate means to travel abroad. He also explained that his departure from the United States and residence in Israel was not a means of avoiding military service. He told the board that he expected to be required to serve in the Israeli Army in the near future and expressed the hope that such service would eradicate any legal difficulties arising from his draft status in the United States. His letter read in part as follows:

> Furthermore, I wish to bring to the attention of the Board that my wife and I upon coming to Israel, have decided to make our permanent home here. This decision was the culmination of many years of education and training in this direction and was, I believe, a perfectly natural and legitimate one on our part. We came here not with the desire to

escape our former obligations and ties, but, rather, to enter into new ones, closer to our hearts, here in our ancient homeland, Israel.

Having made the decision to remain here I will be required in the near future to serve in the Israel Defence Forces, an act which I concider [sic] to be my personal duty as a Jew.

I therefore appeal to the Board to reconsider my case and grant me an extension until such time as I will be inducted into the Israel Defence Forces, at which time I hope my case can be closed legally.

He wrote again in 1971, to remind the board that he had never asserted an intention not to comply with his obligation to report for induction, but had instead informed the board of his financial inability to make an overseas trip. Despite his repeated explanations that finances prevented him from traveling to either the point of physical examination or induction, the government never tendered any travel assistance, even though there was a regulation formalizing the existence of such assistance from June 14, 1971, approximately a year before Mr. Salzmann was indicted. Local Board Memorandum No. 73, Par. 7(a)(1) (1971), 4 Sel.Serv.L.Rep. 2190:2, stated that the military may provide transportation from the United States air base closest to the overseas residence to the processing center.

On February 3, 1971, the local board filed a delinquent registrant report referring Salzmann for prosecution. Nearly seventeen months later, in June of 1972, Mr. Salzmann was indicted for his failure to report for a physical examination and induction.

Defendant wrote the Assistant United States Attorney to explain once again that lack of money prevented him from appearing. He had not run away from his American military responsibilities, he said, but to the contrary, had always kept his board informed of his whereabouts. He further explained that his actions were a result not of a flight from responsibility but

the culmination of many years of Zionist training. . . . I therefore consider it an insult to treat my case as if it were of one who ran away at the last moment to a neighboring country or one who deserted the Army. On the contrary, I did not run away from America but went to Israel for possitive [sic] reasons.

He stated again that he expected to serve in the Israeli Army and hoped that that would change his eligibility for service in the American Army. As he anticipated, Mr. Salzmann did serve in the Israel Defense Forces.

Under a procedure approved by the Second Circuit in *United States v. Weinstein*, 511 F.2d 622, 629 (2d Cir. 1975), Mr. Salzmann, although still residing abroad, asked Professor Louis Lusky to represent him. A motion to dismiss was then heard. Evidence, including the full selective service file was introduced. Briefs and affidavits filed in related selective service cases were deemed before the court. *See United States v. Lockwood*, 386 F.Supp. 734 (E.D. N.Y.1975).

## II. LAW

Before analyzing the Sixth Amendment right to a speedy trial, it is appropriate to first discuss the rights attaching to defendants under the series of Speedy Trial Plans that have been in effect while Salzmann has been under indictment. In some ways the Plans have expanded the constitutional guarantees and they provide an independent basis for decision permitting avoidance of the constitutional issue. *Ashwander v. TVA*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Neither party has raised the issue of whether the various Speedy Trial Plans were validly adopted. Their validity, therefore, will be assumed for the purpose of examining Salzmann's claims. Following analysis of the Speedy Trial Rule issues we turn to a discussion of the Sixth Amendment right. We then consider whether this is an appropriate case to invoke the Federal Rules of Criminal Procedure Rule 48(b) power to dismiss for unnecessary delay by

the government. Finally, we briefly consider the special speedy trial statutory requirements applicable to selective service cases.

## A. Speedy Trial Rules

Enthusiasm for Speedy Trial Plans that would define with some precision the outer limits of permissible delay grew in the sixties as trial delays, attributable to many factors, were increasing dramatically. The Administrative Office of the United States Courts began, in 1963, to keep statistics on the time that elapsed between the filing of the criminal information or indictment and the final disposition at the district court level. The chart below indicates that the length of the median time interval from filing to disposition climbed fairly steadily from 1963 to 1972, more than doubling during that period.

TABLE 54—*United States District Courts criminal defendants disposed of showing median time interval from filing to disposition fiscal years 1963 and 1967–1975*

| Type of disposition and median time interval | Fiscal years | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1963 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
| Total ...... | 34,403 | 31,535 | 31,843 | 32,796 | 36,356 | 44,615 | 49,516 | 46,724 | 46,543 | 48,244 |
| Median (months) ... | 1.6 | 2.5 | 2.9 | 2.5 | 3.2 | 2.9 | 3.4 | 3.9 | 3.8 | 3.6 |

NOTE. Excludes District of Columbia and the territories of Canal Zone, Guam and Virgin Islands.

1975 Annual Report of the Director of the Administrative Office of the United States Courts 264, Table 54. They are median figures; delay in thousands of cases was and is many months greater.

Part of the slight decrease in delay in the last few years has been attributed to the various Speedy Trial Plans in effect. *Id.* at 265–66. But part is also due to the decrease in selective service prosecutions. As the Director of the Administrative Office noted:

> The number of months from filing to disposition of a defendant has been decreasing, primarily as a result of the decline in the number of Selective Service Act cases, which have a high number of fugitive defendants. These cases when disposed of generally have a large span of time from filing to disposition.

*Id.* at 265.

The lengthening of delays in the 1960's is also a consequence of a continued and substantial rise in the number of cases, both criminal and civil, filed in the district courts. It is noteworthy that between 1960 and 1970, the number of criminal cases filed rose by approximately one-third. *Id.* at 189, Table 13. Courts were ill-equipped to deal with the delay this burgeoning caseload entailed, particularly since there has been no equivalent increase in judgeships. *Id.* at 188.

The Supreme Court had dealt with the Speedy Trial Clause of the Sixth Amendment only infrequently, most of the decisions having been handed down in the last two decades. Lower courts were frustrated in applying the Clause not only because of the paucity of appellate rulings but also because of the nature of the guidance. Until the watershed decision in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court dealt with the cases on an ad hoc basis, making no attempt to lay down detailed guidelines. In *Barker* the Court announced various balancing factors that must be weighed in deciding whether the right has been violated. Valuable as such a sophisticated test is, however, it reduces predictability and increases problems in decision making for the government, defendants and courts.

The House Report on the Speedy Trial Act of 1974 noted the need for legislation in order to enforce the Sixth Amendment.

The [Judiciary] Committee finds that the adoption of speedy trial legislation is necessary in order to give real meaning to that Sixth Amendment right. Thus far, . . . the decisions of the Supreme Court [have not provided] the courts with adequate guidance on this question.

The Supreme Court has held that the right to a speedy trial is relative and depends upon a number of factors. A delay of one year in some instances has been interpreted as prima facie evidence of a denial of the right. However, in others, a delay of up to eighteen years has been held not to violate the Sixth Amendment. In its 1972 decision, *Barker v. Wingo,* 407 U.S. 514, [92 S.Ct. 2182, 33 L.Ed.2d 101] the Court stressed four factors in determining whether the right to a speedy trial had been denied to a defendant: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. The task of balancing these factors and arriving at a conclusion which is fair in all cases is difficult. The case provides no guidance to either the defendant or the criminal justice system. It is, in effect, a neutral test which reinforces the legitimacy of delay.

With respect to providing specified time periods in which a defendant must be brought to trial, the Court in *Barker* admitted that such a ruling would have the virtue of clarifying when the right is infringed and of simplifying the courts' application of it. However, the Court said:

> But such a result would require this Court to engage in legislative or rule-making activity, rather than in the adjudicative process to which we should confine our efforts. *Id.* at 523.

H.R.Rep.No.1508, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News, pp. 7401, 7404–05.

Despite the Supreme Court's hesitancy to lay down detailed rules, lower courts have not felt so constrained. During the entire time Salzmann has been under indictment, the Eastern District of New York has operated under court-promulgated speedy trial rules. The Second Circuit Rules Regarding Prompt Disposition of Criminal Cases were effective as of July 5, 1971. Mr. Salzmann was indicted almost a year after, in June of 1972. Since his indictment two other sets of rules have been in force. On April 1, 1973, the Plan for Achieving Prompt Disposition of Criminal Cases, which was passed pursuant to the requirement of Rule 50(b) of the Federal Rules of Criminal Procedure, went into effect. And from September 29, 1975, the Interim Plan of the United States District Court for the Eastern District of New York Under the Speedy Trial Act of 1974, has governed court practice in criminal cases. As of July 1, 1976, a Transitional Plan was effective.

Each of these sets of rules contains a series of similarly worded relevant provisions. Each requires the government to be ready for trial by six months or less after indictment unless an enumerated exception applies. All sets of rules also permit an exception for delay due to a defendant's unavailability. Before singling out these and other pertinent provisions and analyzing them, it will be helpful to review the history of these sets of speedy trial rules. An understanding of their genesis and of the goals of the courts and judicial bodies that approved them assists in the application of the specific rules.

1. History of Speedy Trial Rules

a. ABA Standards

The texts of the four sets of rules that have been in effect in the Eastern District since 1971 share a common origin. The basic structure of the plans and much of the language was first available in the "Standards Relating to Speedy Trial," a report of the ABA Advisory Committee on Criminal Trial. The tentative draft of the Standards, which was published in May of 1967, was approved by the ABA House of Delegates in February of 1968.

The drafters of the Standards, like those of all subsequent Plans, recognized that dual interests are at stake in speedy trial rules. A speedy trial is not only in the

interest of the defendant, but also in the interest of the public. The Standards "effectuate the right of the accused to a speedy trial and the interest of the public in prompt disposition of criminal cases. . ." A.B.A. Standards Relating to Speedy Trial 1.1 (Approved Draft 1968).

Apart from the express recognition of the benefits of a speedy trial to the public and defendant, the ABA committee left a legacy in the formulation of rules far stricter than the constitutional requirements as defined by the then current case law. It recommended that courts adopt a maximum delay period, even for cases of non-incarceration, and rejected suggestions that the defendant show the government's delay had been purposeful or oppressive, *Pollard v. United States,* 352 U.S. 354, 361–62, 77 S.Ct. 481, 486, 1 L.Ed.2d 393 (1957), or that it have prejudiced the defendant, *United States ex rel. Solomon v. Mancusi,* 412 F.2d 88, 90–91 (2d Cir.), *cert. denied,* 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969).

This ABA approach relied upon an assumption not previously recognized that any delay is prejudicial to a defendant and that a delay of a specified period is so manifestly prejudicial as to require dismissal of the indictment with prejudice absent an acceptable excuse. The Committee's adoption of absolute discharge of the defendant barring any future prosecution for the offense charged was a fairly radical proposal, but "the only effective remedy" in the view of the Committee. A.B.A. Standards Relating to Speedy Trial, Commentary to 4.1 (Approved Draft 1968). *See United States v. Furey,* 514 F.2d 1098, 1105 (2d Cir. 1975). *But cf.* Amsterdam, Speedy Criminal Trial: Rights and Remedies, 27 Stan.L.Rev. 525, 537 (1975). Furthermore, the abandonment of any requirement that the defendant demand his right to a speedy trial shifted even more of the responsibility for a prompt trial to the government. *See, e. g., United States v. De Masi,* 445 F.2d 251 (2d Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971) (3⅓ year delay plus 4 year preindictment delay not improper). A defendant's silence even over a pro-

longed period would not bar a motion to dismiss the indictment on speedy trial grounds. The Standards permitted the government to claim that the defendant had waived the speedy trial claim only after the defendant pled guilty or proceeded to trial.

### b. 1971 Second Circuit Rule

It was not long after their publication that the Standards bore fruit in the Second Circuit. The Court of Appeals in 1971, acting on its own initiative and relying on its interpretation of its own supervisory powers and 28 U.S.C. § 332, issued the Rules Regarding Prompt Disposition of Criminal Cases in federal courts at the close of an *en banc* decision rejecting a state prisoner's habeas corpus petition. *United States ex rel. Frizer v. McMann,* 437 F.2d 1312 (2d Cir. 1971). The petitioner had pressed a Sixth Amendment speedy trial claim after ten and a half months had elapsed between indictment and trial. Although the court rejected his claim, sitting as the Circuit Council it enunciated Rules for the federal district courts of the Circuit. The Rules went far beyond the constitutional right in some respects.

As suggested by the Standards, the Rules prescribe a maximum period for prosecutorial delay, and eschew any requirement that a defendant show prejudice or make a timely demand in order to invoke the protection of the Rules. The government's failure to abide by the Rules warrants dismissal of the indictment. But in two significant ways the Rules are narrower in scope than the Standards. The Rules proscribe government delay alone and they permit a six month delay.

The ABA Standards were drafted to cover trial delay generally, not just delay due to prosecutorial inaction. Thus, the Standards also gave relief to defendants whose trials were delayed by such factors as court congestion. In contrast, the Second Circuit's Rules focused primarily, if not exclusively, on delay due to the conduct of the prosecution, despite the fact that only a

limited number of reasons for delay cited by the court are attributable to the prosecution. *United States v. Infanti,* 474 F.2d 522, 528 (2d Cir. 1973). In the course of the *Frizer* opinion the Second Circuit summarized eighteen major causes of delay in criminal cases in New York State, four of which were due to the prosecution. The court reported a New York Judicial Conference finding that personnel shortages in district attorneys' offices, part-time assistant district attorneys, part-time district attorneys in some counties, and adjournments sought because of non-appearance of key witnesses and police officers were the primary reasons for state court delay attributable to the prosecution. *United States ex rel. Frizer v. McMann,* 437 F.2d 1312, 1314–15 (2d Cir. 1971). Only the first and last of these reasons would be applicable to delays by the United States. In shifting the emphasis from trial delay to government readiness for trial, and at the same time, adopting the ABA remedy for failure to abide by the rules, i. e., dismissal, the Second Circuit placed a significant affirmative duty on the government. This duty is of particular import to Mr. Salzmann since there is no indication of any active resistance on his part to prosecution. He notified the government that financial restrictions alone made it impossible for him to appear, both for induction and for prosecution.

The other significant change from the Standards to the Rules Regarding Prompt Disposition was the choice by the Second Circuit of a six month limitation on delay. The drafters of the Standards had refrained from selecting a time frame; but six months was at the outside of the range of figures outlined in the Commentary to Rule 2.1. The President's Crime Commission proposed that the period from arrest to trial be not more than four months. President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 155 (1967). Nevertheless, the Rules are consistent with the Standards in designating a period beyond which further delay will be considered inherently prejudicial.

The Circuit Council considered the heavy burden it placed on the government necessary in light of the public interest in prompt disposition of cases.

The public interest requires disposition of criminal charges with all reasonable dispatch. The deterrence of crime by prompt prosecution of charges is frustrated whenever there is a delay in the disposition of a case which is not required for some good reason. The general observance of law rests largely upon a respect for the process of law enforcement. When the process is slowed down by repeated delays in the disposition of charges for which there is no good reason, public confidence is seriously eroded.

Statement of the Circuit Council to Accompany Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, New York Federal Court Rules 4–25.

c. Federal Rules of Criminal Procedure Rule 50(b) Plan

Rule 50(b) of the Federal Rules of Criminal Procedure inaugurated the first national effort at speedy trial rulemaking. Drafted by the United States Judicial Conference, and submitted to Congress by the Supreme Court, the Rule has been in effect since January, 1973. It directs each district court to "prepare a plan for the prompt disposition of criminal cases." Pursuant to Rule 50(b), the Committee on the Administration of the Criminal Law of the United States Judicial Conference prepared a Model Plan which was submitted by the Administrative Office of the United States Courts to each district court, but each district had the option of preparing its own plan.

The Eastern District Plan, which became effective on April 1, 1973, contained only minor variations from the Second Circuit Rules then in effect. As a result, the Eastern District Plan imposed a stricter standard on the government than the Model Plan. For instance, the Model Plan contained no mandatory sanction for failure to provide a speedy trial, other than the release of incarcerated defendants from custody. Rule 50(b) Model Plan § 4, Hearings on S. 754 Before the Subcomm. on Constitu-

tional Rights of the Senate Comm. on the Judiciary, 93d Cong., 1st Sess., at 219 (1973). In contrast, the Eastern District Plan provided for dismissal with prejudice when an unexcused delay exceeded six months. While the Model Plan suggested a six months maximum delay period, it allowed the court to grant continuances whenever it was satisfied that the "interests of justice" would be served. Rule 50(b) Model Plan § 3, *id.* at 218–19. The Eastern District Plan contains specific exceptions to the six months rule, and thereby, severely restricts the court's discretion. All 50(b) Plans are similar, however, in "that they place an affirmative duty on the government to bring the accused to trial." *United States v. Rodriguez*, 497 F.2d 172, 175 (5th Cir. 1974).

The Subcommittee on Crime of the House Judiciary Committee had deferred drafting its own speedy trial rules until it could assess the implementation of the Rule 50(b) Plans. Relying heavily on a critical report prepared by Professor Daniel J. Freed and Mr. Andrew H. Cohn of Yale Law School, the Subcommittee concluded that "Rule 50(b) and the Model Plan adopted by many district courts is an inadequate response to the need for speedy trial, in that it encourages the perpetuation of the status quo." H.R.Rep.No.1508, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News, pp. 7401, 7406. The Freed report had reviewed 92 district plans. In summary it found that

. . . circuits differ in the degree of uniformity among their district plans, with most circuits not enforcing any strict uniformity; the goal of the Model Plan, that the suggested time limits be shortened by the districts is largely unrealized; the Model Plan grants broad discretion with respect to the extensions of time limits—a pattern which is followed in most districts. The report further indicates that a comparison of actual court proceeding time and the Rule 50(b) plans for 20 districts shows that a strong correlation exists between the time limits adopted in the districts and the prevailing norm at the time of adoption.

*Id.* As a result of disappointment with Rule 50(b), Congress adopted the Speedy Trial Act of 1974.

d. Speedy Trial Act of 1974

In all but one respect the Speedy Trial Act of 1974 imposes a much heavier burden on the government to insure a prompt trial than any of the Plans that have been in effect in the Eastern District. The Act shortens the time span of permissible delay generally, not just prosecutorial delay. But at the same time the Act introduces remedial flexibility by allowing a court to dismiss an indictment with or without prejudice as circumstances indicate.

The limitation of the period of acceptable delay and the increased scope of the Act indicate Congress' strong bias against delay in bringing defendants to trial and its concomitant willingness to place a heavy burden on the government, both the prosecutor and the court, to insure a speedy trial. Specifically, the Act provides that an indictment must be filed within thirty days from arrest or service of summons. The arraignment must be within ten days following indictment and trial must be within sixty days thereafter. To allow the courts to fully comply with this one hundred day time period, however, the Act does not become fully operative until five years after it takes effect. As a result, the six month interval permitted under the 50(b) Plan will be only gradually reduced to one hundred days.

An even more impressive indication of the strength of Congressional disapproval of delay is the return to the broad scope of the A.B.A. Standards. The Speedy Trial Act does not merely require prosecutorial readiness like the Second Circuit Rules and the 50(b) Plan but it mandates prompt trials generally. *See United States v. Furey*, 514 F.2d 1098, 1101 (2d Cir. 1975). Delays due to the court and the defense are dealt with legislatively, along with prosecutorial delay. In fact, the Act explicitly forbids a judge from granting a continuance due to court calendar congestion. 18 U.S.C.A. § 3161(D)(8)(c). The Act also takes a much firmer line against the prosecution than

previous plans by, for example, removing failure to obtain available witnesses as an excuse for delay. *Id.* These two provisions are examples of the Congressional decision to restrict the excuses for what may be termed neutral factors like court congestion; they are no longer acceptable. In its discussion of its rejection of calendar congestion and unobtained witnesses as excuses for delay, the House Report on the bill eventually passed as the Speedy Trial Act noted the hard line it was taking against what it termed "institutional delay." It reasoned that

> . . . the nature of the concept of speedy trial is one which recognizes that institutional delays occasioned by poor administration and management can work to the detriment of the accused. Placing a prohibition on the granting of continuances for these reasons serves as an incentive to the courts and the Government to effectively utilize manpower and resources so that defendants may be tried within the time limits provided by the bill.

H.R.Rep.No.1508, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News pp. 7401, 7426. *See* Steinberg, Right to Speedy Trial: The Constitutional Right and Its Applicability to the Speedy Trial Act of 1974, 66 J.Crim.L. & Criminology 229, 235 (1975).

To balance the breadth of the Act's prohibition against delay, the remedial section of the Act explicitly provides courts with greater flexibility than any of the predecessor Plans and perhaps even greater flexibility than is allowed by the Constitution. *See Strunk v. United States,* 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973); H.R.Rep.No.1508, 93d Cong., 2d Sess., 1974 U.S.Code Cong. & Admin.News pp. 7401, 7430. *But see* Amsterdam, Speedy Criminal Trial: Rights and Remedies, 27 Stan.L. Rev. 525, 535–37 (1975). The Act requires a court to dismiss an indictment after a defendant fails to be indicted or tried within the time set by the Act. But the dismissal may be either with or without prejudice. In making the determination as to which sanction is appropriate, a court is required to consider "the seriousness of the offense;

the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Act] and on the administration of justice." 18 U.S.C.A. § 3162(a)(1), (2).

Although the Act does not become fully effective until 1979, it requires the adoption of Interim Plans. The Interim Plan for the Eastern District of New York was effective September 29, 1975. With the exception of some areas that were not covered in previous plans, such as sentencing and juvenile proceedings, the Interim Plan is virtually identical to the 50(b) Plan in effect in the Eastern District since 1973.

A Transitional Plan, effective July 1, 1976, has also been adopted pursuant to the Act. It grants a certain degree of discretion to accept waivers, but its details are of no pertinence since the court has, under the terms of the 1976 Plan, found no waiver by Salzmann and no valid legal reason for prosecutorial delay. Since so little time has elapsed under the Transitional Plan we treat it, for the purposes of this discussion, as if it were identical with the Interim Plan.

### 2. Application of Speedy Trial Rules to Defendant

All applicable Plans that have been in effect since Salzmann was indicted contain similarly worded provisions that pertain to the circumstances surrounding the delay in the adjudication of his case. The Second Circuit Rules, the 50(b) Plan, and the Interim Speedy Trial Plan contain (1) the basic standard that an indictment must be dismissed if the government is not ready for trial within six months following indictment, (2) an exception to the basic standard when the government cannot obtain the presence of an unavailable defendant by due diligence, (3) a description of the efforts the government must make to obtain a defendant's presence in a situation that is somewhat analogous to that of the unavailable defendant, i. e., when the defendant is imprisoned elsewhere, and (4) an exception to the basic standard when there are exceptional circumstances or excusable neglect.

### a. Government Readiness Requirement

Any analysis of whether or not Salzmann has been deprived of his right to a speedy trial as defined by our local Plans must begin with the rule which sets down the basic proposition that unless there is an applicable enumerated exception elsewhere in the rules, the indictment must be dismissed with prejudice if the government is not ready for trial within six months from the start of criminal proceedings. The Second Circuit Rules, which were in effect when Salzmann was indicted, embody this standard in Rule 4. It reads as follows:

> 4. In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, or within the periods as extended by the district court for good cause under rule 5, and if the defendant is charged only with non-capital offenses, then, upon application of the defendant or upon motion of the district court, after opportunity for argument, the charge shall be dismissed.

This basic government readiness rule is contained in Rule 4 of the 50(b) Plan and Rule 5 of the Interim Speedy Trial Plan, which are identical to each other. They read as follows (numbers in brackets refer to Interim Speedy Trial Plan):

> 4.[5] *All Cases: Trial Readiness and Effect of Non-Compliance.*
>
> In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, and if the defendant is charged only with non-capital offenses, the defendant may move in writing, on at least ten days' notice to the government, for dis-

missal of the indictment. Any such motion shall be decided with utmost promptness. If it should appear that sufficient grounds existed for tolling any portion of the six-months period under one or more of the exceptions in Rule 5[6], the motion shall be denied, whether or not the government has previously requested a continuance. Otherwise the court shall enter an order dismissing the indictment with prejudice unless the court finds that the government's neglect is excusable, in which event the dismissal shall not be effective if the government is ready to proceed to trial within ten days.

These Plans would appear on their face to differ from the Second Circuit Rules in two noteworthy respects. First, they state that the dismissal of an indictment for unexcused government delay shall be with prejudice. But, court interpretation of the Second Circuit Rules had established that dismissal under the Rules was also with prejudice. *Hilbert v. Dooling,* 476 F.2d 355 (2d Cir.) (en banc), *cert. denied,* 414 U.S. 878, 94 S.Ct. 56, 38 L.Ed.2d 123 (1973). Second, the two more recent Plans contain an excusable neglect provision that permits a court to allow the government to proceed to trial immediately despite the fact that no enumerated exception can be cited to toll the six-month time limit on delay. This escape hatch will be discussed in more detail later, along with similar provisions in the Plans. *See* II A 2 d, *infra.*

Since Salzmann was indicted in June of 1972, the Second Circuit Rules required the government to be ready for trial by December of 1972. When the United States Attorney in the Eastern District of New York is ready for trial it is the United States Attorney's practice to communicate that readiness by issuing a written notice of readiness. This practice was made mandatory by the Second Circuit in *United States v. Pierro,* 478 F.2d 386 (2d Cir. 1973). The court in *Pierro* stated it would be

> inconsistent with the intent of the Circuit Council . . . and with sound public policy, to free the Government from the

responsibility of communicating its readiness for trial to the court.

478 F.2d at 388. Government issuance of a notice of readiness eliminates the necessity for an evidentiary hearing to determine whether in fact the government was ready for trial within the six-month period in those cases which go to trial after the period has run. The notice also assists district courts in control of their calendars. And, ultimately, it is the district courts' ability to control their calendars efficiently that will determine if the objectives of the Rules can be achieved. The government has yet to file a notice of readiness in the Salzmann case. As a result, unless the six-month period is tolled by one of enumerated exceptions or the government's neglect is excusable, the indictment must be dismissed. *See,* *e. g., United States v. Flores,* 501 F.2d 1356, 1358–59 (2d Cir. 1974); *United States v. Favaloro,* 493 F.2d 623, 624 (2d Cir. 1974); *United States v. Scafo,* 480 F.2d 1312, 1318 (2d Cir.), *cert. denied,* 414 U.S. 1012, 94 S.Ct. 378, 38 L.Ed.2d 250 (1973).

b. Requirement that Government Exert Due Diligence to Obtain Unavailable Defendants

▪ All three Plans toll the six-month period in which the government must be ready for trial when the delay is occasioned by the unavailability or absence of the defendant. The Second Circuit Rules embody this exception in Rule 5(d), which reads as follows:

5. In computing the time within which the government should be ready for trial under rules 3 [incarcerated defendants] and 4, the following periods should be excluded: . . .

(d) The period of delay resulting from the absence or unavailability of the defendant. A defendant should be considered absent whenever his location is unknown and in addition he is attempting to avoid apprehension or prosecution or his location cannot be determined by due diligence. A defendant should be considered unavailable whenever his location is known but his presence for trial cannot be obtained by due diligence. . . .

The 50(b) Plan and the Interim Speedy Trial Act Plan have an almost identical exception in Rules 5(d) and 6(d), respectively. The only major variation is the shortening of the definition of an absentee to read:

A defendant should be considered absent whenever his location is unknown.

In short, the rules define an absent defendant as one whose location is unknown to the government. Since Salzmann diligently kept his draft board and then the United States Attorney informed of his address in Israel, the Plans' definitions prevent him from being numbered among absent defendants.

▪ The other provision of 5(d) [6(d)] pertains to defendants whose location is known by the government and yet whose presence the government is unable to obtain by due diligence. Such defendants are labelled unavailable. The Transitional Speedy Trial Act Plan effective from July 1, 1976, adds a further elaboration to the definition of unavailability. It reads

A defendant . . . shall be considered unavailable whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial.

Rule 10(a)(3)(B). There is no indication in the record that Salzmann has resisted any attempts the government has made to produce him for trial. There is no record that the government has made any effort, beyond indicting the defendant, to procure Salzmann's presence. The crucial phrase in the definition of unavailability remains, therefore, the due diligence clause of the predecessor Plans. Because the government has not demonstrated that it could not have obtained Salzmann's presence in the United States, both before and after indictment, the government's failure to do so amounts to a failure to exercise due diligence. As a result, this exception cannot be relied upon by the government to toll the requirement that it be ready for trial within six months of indictment.

In almost every piece of the correspondence that Salzmann had with the government following the scheduling of a pre-induction physical, he alluded to his financial inability to travel abroad. In his letter of December 17, 1970, for example, he explained his inability

> to show up at the physical was . . . due to the shortage on my part of the necessary Dollars required to undertake such a trip. This is also the reason for my continuing failure to appear at said physical examination.
>
> Although I work at present I get paid only in local currency and a trip abroad must be paid for in Dollars or else an exorbitant tax is levied. The money that I make is barely enough to support my wife and me and we find it quite impossible to save enough money in the immediate future for such a large expense.

He concluded the letter with the plea, futile as it turned out, that the government "take my situation into account." On January 6, 1971, Salzmann answered his notification to report for induction with the following explanation:

> I wish to inform the Board that since I am in Israel I have no means at my disposal to appear at the Examination and Entrance Station at fort [sic] Hamilton at the time and date specified.

And again, he wrote on February 13, 1971:

> Please be advised that at no time did I assert that I have no intention of complying with my obligation to report for induction. I did, however, mention that my financial situation does not at this time allow me a trip to the United States.

Despite Salzmann's repeated explanations that finances prevented him from leaving Israel for either his military obligations or court proceedings, the government neglected to inform him of the travel assistance it had at its disposal. On June 14, 1971, approximately a year before the indictment, the rules for processing overseas registrants were significantly liberalized by a revision of Local Board Memorandum No. 73. 4 Sel.Serv.L.Rep. 2190. The 1971 revision required that overseas registrants be provided with a Transmittal Letter for Delivery for Induction informing them of the assistance available to transport them between their overseas residence and the overseas preliminary processing point, and between the preliminary processing point and the continental United States Examining and Entrance Stations. The Memorandum instituted a flexible system of aid combining military and commercial transportation. It ordered the Army Area Commander in whose jurisdiction the overseas registrant resided to

> (2) Authorize transportation of registrant from United States military air base closest to his place of overseas residence to collection point if required.
>
> (3) Advise registrant of the name and location of the military air base and flight information for his transportation to the collection point and furnish him necessary travel authorization.

Local Bd. Memo. No. 73, ¶ 7(b), 4 Sel.Serv.L. Rep. 2190:2. If the

> registrants [were] not found acceptable for induction into the Armed Forces during processing at the collection point [, then] registrants who were delivered to the collection point shall be authorized return air transportation when requested.

*Id.* ¶ 7(b)(7). Those registrants found acceptable for induction, however, would be provided

> with necessary Travel Orders or MAC Transportation Requests for return to the continental United States and advice of particular flight arrangements.

*Id.* ¶ 7(b)(8). Once in the United States the registrants were to report to their appropriate local board, which would provide

> Transportation by commercial or other expeditious means . . . to . . . Armed Forces Examining and Entrance Station.

*Id.* ¶ 7(c)(2), (3).

> If the registrant failed to qualify for induction into the Armed Forces [, then he] may elect to (1) be released from Armed Forces Examining and Entrance Stations or (2) request air transportation back to initial place of reporting for delivery or collection point established by

the Army Commander of the area of jurisdiction. . . .

When the registrant elects to be returned overseas, the AFEES Commander will prepare Military Travel Authorization for return from Port of Aerial Embarkation to overseas point at which registrant reported to Army Area Commander for delivery for induction. AFEES Commander will also provide registrant with commercial transportation ticket or travel authorization furnished by aligned local board for his return to local board.

*Id.* ¶ 10.

In summary, the Memorandum provided a comprehensive, intricate system of transportation for overseas registrants like Salzmann to and from processing points. It is true that the Memorandum went into effect after the initial dates for Salzmann's physical examination and induction, but the Memorandum was nevertheless highly pertinent to him because of his continuing duty to report for pre-induction. 32 CFR 1628.-10(b) (1972) provides in part:

Regardless of the time when or the circumstances under which a registrant fails to report for armed forces examination when it is his duty to do so, it shall thereafter be his continuing duty from day to day to report for armed forces examination to his local board and to each local board whose area he enters or in whose area he remains.

■ Even if the Memorandum had never existed, the government was probably under an obligation to provide travel assistance for needy Americans it ordered to return from residence abroad. A failure to do what is impossible negates *mens rea.* Cf. A.L.I. Model Penal Code § 2.01.

Admittedly, it was Salzmann's duty to fulfill his military obligations. But it is very harsh not to give him necessary assistance in the performance of his duty, especially when he was not actively avoiding his obligations and when travel assistance in the form of free space on a military flight would have been relatively easy to provide. It is in the interests of both the country and the individual citizen that the government lighten the burdens it imposes on its citizenry whenever possible.

In another situation in which Americans have an obligation to their country, that is, appearance pursuant to subpoena, the government has taken pains to provide assistance to those living abroad. There is a statute ensuring that travel expenses will be tendered to Americans living abroad who are subpoenaed to appear as witnesses in the United States. 28 U.S.C. § 1783. In *United States v. Danenza,* 528 F.2d 390 (2d Cir. 1975), tender of such expenses was a necessary predicate to a finding that a grand jury witness was in civil contempt for failure to comply with the subpoena. How much more important to tender travel expenses when it will allow the recipient to fulfill his military obligations or when it will ensure his constitutional right to a speedy trial.

■ The phrase "due diligence," if it is to have any meaningful content must at the very least embody the responsibility of the government to read its mail and respond intelligently. If the government has at its disposal a means of procuring a defendant's presence with a minimum expenditure of effort, and here the effort may only have entailed informing the defendant of an existing government program of travel assistance, then due diligence must require the government to make this effort. The government cannot complain of the defendant's continued unavailability when the government chooses not to employ means readily at its disposal to procure his presence. *See United States v. Estremera,* 531 F.2d 1103 (2d Cir. 1976) (government's mistaken reliance on deportation rather than extradition did not negate good faith). *Cf. United States v. Knight,* 529 F.2d 594 (2d Cir. 1975) (period after defendant's location in Canada from disappearance to arrest in Florida excluded).

■ Instead of acknowledging its dereliction, the government has responded to Salzmann's speedy trial rule claim as follows:

We . . . do not believe that a fugitive defendant may assert a claim that he

has been deprived of his right to a speedy trial.

Letter of Assistant United States Attorney Thomas Maher, *United States v. Sidney Salzmann* (Jan. 16, 1975). The government's response disregards the Rules' directive that the government use due diligence to try to obtain the defendant's presence. By stressing that the defendant is a fugitive, the government seeks to absolve itself from making any effort to procure his presence for trial. Rule 5(d) is specifically addressed to those situations in which the accused is a fugitive and places the burden of due diligence on the government nonetheless.

In cases preceding speedy trial plans, and even in cases preceding modern Supreme Court Sixth Amendment decisions, courts have held that circumstances did not justify delay when the accused was "unavailable" only because of the negligence of authorities in failing to pursue him, and not because of any deliberate evasion on the part of the accused. *See, e. g., People v. Serio,* 13 Misc.2d 973, 181 N.Y.S.2d 340 (1958) ("mere failure of defendant to take affirmative action to prevent delay may not . . . be construed as a waiver . . .").

The government's failure to respond to Salzmann in any meaningful way may be particularly egregious since this is a draft case. In a long line of cases covering diverse areas of the intricate draft laws and accompanying regulations, courts have required the government to inform draft registrants of their options and rights because counsel is almost never available prior to indictment. This has not only been true in instances of fairly esoteric provisions, *e. g., Chernekoff v. United States,* 219 F.2d 721, 723 (9th Cir. 1955) (government notice to registrant must inform him of his statutory right to summary of information in his selective service file which might tend to defeat his request for a classification change); *United States v. Dix,* 4 Sel.Serv.L.Rep. 3051 (S.D. Ohio 1971) (requirement that Selective Service System must notify registrant if the job which he is performing is unacceptable for alternative service), but also when

well-known, basic privileges are at stake, *e. g., United States v. Turner,* 421 F.2d 1251, 1255 (3d Cir. 1970) (local board must supply registrant with appropriate form or otherwise inform him of needed procedures when he makes known to local board desire to claim conscientious objector status); *United States v. Moyer,* 307 F.Supp. 613, 615 (S.D.N.Y.1969) (requirement of 32 C.F.R. § 1621.11 imposing duty on local board to provide conscientious objector Form 150 interpreted as mandatory and fatal to indictment if not fulfilled); *United States v. Sobczak,* 264 F.Supp. 752 (N.D.Cal.1966) (in ascertaining a conscientious objector claim local board may not limit it to specific, formalized claims).

While the regulations and cases just referred to relate, in the main, to preindictment obligations of the government, *a fortiori* they apply to the post-indictment period. The government has an obligation, at the very least, to inform a defendant claiming lack of sufficient funds to travel to the place of trial, that the United States will advance his costs of transportation.

When the government's action in the Salzmann case is compared to its handling of selective service prosecutions generally, its unresponsiveness to Salzmann seems part of a pattern, rather than aberrational. Selective Service cases are unique in the percentage of long-term indictments pending due to the defendants' fugitive status. The table below shows a dramatic difference between Selective Service cases and other cases in terms of the number of defendants in fugitive status.

FUGITIVE DEFENDANTS IN CRIMINAL CASES PENDING ONE YEAR OR MORE IN THE DISTRICT COURTS AS OF DECEMBER 31, 1973 FOR SELECTED OFFENSES

| Offense | Defendants in Cases Pending 12 Months or More | Fugitives | |
| --- | --- | --- | --- |
| | | Number | Percent |
| Total, all offenses | 11,718 | 7,064 | 60.3 |
| Total, 5 offenses | 6,473 | 5,026 | 77.6 |
| Percent of Total | 55.2 | 71.1 | — |
| Postal theft | 142 | 87 | 61.3 |
| Auto theft | 156 | 98 | 62.8 |
| Forgery | 437 | 228 | 52.2 |
| Narcotics | 2,492 | 1,600 | 64.2 |
| Selective Service Act | 3,246 | 3,013 | 92.8 |

Administrative Office of the United States Court, 1974 Semi-Annual Report of the Director 53. Over 90% of the selective service defendants in cases pending a year or more were fugitives as of the end of 1973, as opposed to 64% of the narcotics defendants, the next highest category reported. The great disparity between selective service cases and others suggests that delays in enforcement of the selective service laws may have had a disproportionately unfair impact on this category of defendants. *See generally* National Advisory Commission on Selective Service, In Pursuit of Equity: Who Serves When Not All Serve? 19 (1967); Tigar & Zweben, Selective Service: Some Certain Problems and Some Tentative Answers, 37 Geo.Wash.L.Rev. 510 (1969).

The high number of fugitives, and as a result, the long trial delays in selective service cases, are due in part to the government's systematic failure to exert the same amount of effort to procure the appearance of Selective Service indictees for trial as it exerts to procure the appearance for trial of persons charged with other federal felonies such as bank robbery, interstate kidnapping, and skyjacking. The court knows, both from its own records and from other judicially noticeable facts, that the government does make the most strenuous efforts to procure the appearance for trial of persons charged with non-Selective Service felonies of the types mentioned, and does not hesitate to seek the return of such persons through diplomatic efforts. This is true even when an extradition treaty does not cover the offense. *See, e. g., Fiocconi v. Attorney General,* 462 F.2d 475 (2d Cir. 1972), *cert. denied,* 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972). Professor Evans has described the numerous practical alternatives to extradition to which this country resorts in "Acquisition of Custody Over the International Fugitive Offender— Alternatives to Extradition: A Survey of United States Practice," 1964 British Yearbook Int'l L. 77 (issued 1966). She concludes that use of these informal measures to obtain fugitives from other nations is inevitable since the bilateral formal agreements upon which extradition is based can-

not be expected to "meet all contingencies arising out of a fugitive's taking asylum abroad." *Id.* at 103.

In contrast, no serious effort has been made to locate and apprehend any of the allegedly fugitive Selective Service defendants who are on this court's docket or to procure their extradition by foreign nations. As recently as 1972, it was reported, and not denied, the government had not requested other governments to extradite or deport selective service indictees. *See* Note, Legal Status of American War Resisters Abroad, 5 N.Y.U.J. Int'l L. & Pol. 503, 522 (1972). The Justice Department admits that "no request has been made upon the Israeli Government for the extradition of fugitives who have been indicted for violation of our selective service statutes." Affidavit of Murray R. Stein, Criminal Division, Dep't of Justice, in *United States v. Salzmann,* 72–CR–740 (June 2, 1976).

The question remains whether efforts by the government would have been so obviously futile as to excuse it from making them. The government has no legal right under present extradition treaties to demand extradition of the defendants from the countries in which most of them reside. Extradition treaties with Canada and Sweden do not require them to honor United States requests to return our military fugitives.

The extradition treaties presently in force between the United States and Canada do not include flight from military service in the list of enumerated, extraditable offenses. The only agreement between the United States and Canada regarding fugitives from military service is no longer in force. Between October 26, 1945, and April 28, 1952, the executive agreement entitled "Apprehension and Return of Deserters from Armed Forces" provided for cooperation between American and Canadian military authorities in "apprehending such offenders and returning them to the custody of the appropriate authority of the government from whose military service they have deserted or are absent without leave." Let-

ter from Ray Atherton, Exchange of Notes at Ottawa, Canada, June 13 and October 26, 1945. [1945] A.D. No. 493, 6 Bevans 403.

The current extradition treaty between the United States and Sweden specifically excludes military offenses. The Convention on Extradition with Sweden Together with Related Protocol, October 21, 1961, Article V., which enumerates those circumstances under which extradition shall not be granted, reads in part:

.　　.　　.　　.　　.

4. When the offense is purely military.
5. If the offense is regarded by the requested State as a political offense or as an offense connected with a political offense.

[1961] 14.2 U.S.T. 1845, T.I.A.S. 5496.

Our treaty with Israel does not require that country to surrender Salzmann either. Even though Israel does have a draft, its extradition treaty with us does not explicitly cover this offense. See Convention on Extradition Between the Government of the United States of America and the Government of the State of Israel, December 5, 1963, 14 UST 1707. Article 21 of the Israeli Extradition Act prohibits surrender for offenses other than those specified if a treaty requires enumeration, as does the Extradition Convention Between Israel and the United States.

■■■■ Even if the federal government lacks the legal right to demand extradition, it may be required by the due diligence clause to request surrender of the defendants. Unless the asylum country has explicitly denied a request for extradition as a matter of comity (or a request for deportation, which would ordinarily have the same effect), it cannot be assumed that such a request would be denied—so that failure to make the request is failure to act with due diligence. *United States v. McConahy,* 505 F.2d 770 (7th Cir. 1974). Every nation has the sovereign power, under international law, to extradite fugitives if it so elects. *See Fiocconi v. Attorney General,* 462 F.2d 475, 478 (2d Cir. 1972), *cert. denied,* 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972); *Chandler v. United States,* 171 F.2d 921, 935

(1st Cir. 1948), *cert. denied,* 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949); *United States v. Sobell,* 142 F.Supp. 515, 524 (S.D. N.Y.1956), *aff'd,* 244 F.2d 520 (2d Cir.), *cert. denied,* 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957). *See also Mancusi v. Stubbs,* 408 U.S. 204, 222–24, 92 S.Ct. 2308, 2317–18, 33 L.Ed.2d 293 (1972) (Marshall, J., dissenting). 6 Whiteman, Digest of International Law 727–28 (1968); Tate, Draft Evasion and the Problem of Extradition, 32 Albany L.Rev. 337, 355–57 (1968).

■■■ The most widely recognized ground for refusing to cooperate with another country's attempts to obtain an accused is the recently developed political offense exception. *See* Note, The Status of Political Fugitives and Refugees under United States Law, 2 B'klyn J.Int'l L. 264, 269 (1976). *See generally* 2 A Treatise on International Criminal Law 362 (M. C. Bassiouni & V. Nanda eds. 1973) (military and political offenses generally not extraditable); Tate, Draft Evasion and the Problem of Extradition, 32 Albany L.Rev. 337, 355–57 (1968) (political offenses not extraditable). There is no reason to believe, however, that Israel would invoke this doctrine. From the record available so far, Salzmann's refusal to appear for induction was not politically motivated, but rather the result of financial constraint. At no point did he state that he was protesting any policy of the government.

The Supreme Court has not ruled on the precise questions here involved—whether the federal government is obligated to seek, through diplomatic channels, the return of the felony defendant who has fled to another country. It has held, though, in a speedy trial case, that when "two separate sovereignties" were involved, the former "had a constitutional duty to make a diligent, good-faith effort" to obtain the defendant who was incarcerated in the latter in order to bring the defendant to trial promptly, even though it had no legal right to demand the return of the defendant. *Smith v. Hooey,* 393 U.S. 374, 383, 89 S.Ct. 575, 579, 21 L.Ed.2d 607 (1969).

But the two separate sovereignties in *Smith* were a state and the federal government. In a recent case construing the Sixth Amendment Confrontation Clause the Supreme Court recognized that the relationships, and as a result, the governmental responsibilities, are different within our federal system than in the international system. *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). The Court in *Mancusi* concluded that a state had not infringed on the defendant's right to confront witnesses against him when it failed to obtain a key witness who had testified at an earlier trial, but who resided in Sweden at the time the defendant was retried. The *Mancusi* holding may only be partially transferable to the speedy trial context, however, since different constitutional interests are at stake and the federal government may not always be as powerless to obtain the presence of persons residing abroad as the Court determined a state was in *Mancusi.* At any rate, the Second Circuit assumed as a matter of course in *United States v. Estremera,* 531 F.2d 1103 (2d Cir. 1976), that the Speedy Trial Rules due diligence provision required the government to seek extradition or deportation of fugitives from foreign nations.

The Seventh Circuit faced the precise issue in *United States v. McConahy,* 505 F.2d 770 (1974), and held that there

> is no reason not to apply the rule of *Smith v. Hooey* when the defendant is incarcerated by a foreign government rather than the United States or one of its states.

*Id.* at 773. Accordingly, the court dismissed the indictment for the government's failure to make a diligent good faith effort to procure the defendant from abroad. The fact that the extradition treaty in force between the two countries did not cover the offense did not relieve the government from making an effort to have the defendant extradited. *Id.*

Although the extradition treaty between Israel and the United States does not cover selective service offenses, the history of informal cooperation between the two countries in producing fugitives negates any presumption that Israel would have refused to cooperate in returning Salzmann for trial if he were to refuse to return despite an offer of transportation. For example, before any extradition treaty existed between Israel and the United States, Israel deported Soblen, a convicted spy. *See* O'Higgins, Disguised Extradition: The Soblen Case, 27 Modern L.Rev. 521 (1964); Evans, Reflections Upon the Political Offense in International Law, 57 Am.J.Int'l L. 1, 9–11 (1963); Thornberry, Dr. Soblen and the Alien Law of the United Kingdom, 12 Int'l & Comp. L.Q. 414 (1963); Tate, Draft Evasion and the Problem of Extradition, 32 Albany L.Rev. 337, 352–53 (1968). The case of Meier Lansky is equally well known. He was deported from Israel after a grand jury indicted him for failure to appear before it pursuant to subpoena. The reason Israel gave for the deportation was Lansky's "criminal past," although none of his convictions, all of which were for misdemeanors, were covered in the extradition treaty between the two nations. *See United States v. Lansky,* 496 F.2d 1063 (5th Cir. 1974). *See also* Klein, The Lansky Case, 8 Israel L.Rev. 286 (1963).

The preceding case law and authorities along with the government's failure to advise the court, pursuant to the court's order of May 19, 1976, of any policies or facts to the contrary, make it possible for the court to judicially notice the following facts (see Rule 201, Federal Rules of Evidence):

1. Neither the United States or the State of Israel characterizes violations of military conscription laws as political crimes.

2. The United States follows the policy and practice of endeavoring to procure the return to this country of some indicted defendants without resort to extradition treaties, but does not endeavor to procure the return to this country of defendants indicted for violation of the Selective Service laws or regulations.

3. Israel has produced persons pursuant to requests by the United States despite the fact that no extradition treaty mandated such cooperation.

4. There is a reasonable possibility that Israel would have cooperated in the return of Salzmann had it been asked to do so.

In view of these findings, due diligence would require the government to request Israel's cooperation regardless of the fact that the extradition treaty does not cover Salzmann's alleged offense.

There is some ground to suspect that the government's failure to pursue Selective Service delinquents with the same vigor as it pursues other fugitives may not be due to an evaluation of its chances for success, but rather may be due to policy. *Cf. Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 182–84, 83 S.Ct. 554, 575, 1 L.Ed.2d 644 (1963). A reason for the government's dilatoriness in prosecution of alleged draft offenders was no doubt the unpopularity of the Vietnam war both here and abroad. Allowing draft evaders and military deserters to remain fugitives created a safety valve for the discontented. Aggressively seeking their return and prosecuting them vigorously would have provided a focal point for even stronger anti-American demonstrations abroad and established a series of martyrs for the anti-war movement at home. Allowing those who were unwilling to serve in the Armed Forces to reside unmolested in foreign countries was not only a humane policy, but also in the government's best interest. In fact, it may have been so congruent with the national interest that the government may have had very little choice in the matter.

■ Whatever the government's reasons for seeking the return of war related fugitives less vigorously than other alleged felons, whether the reasons are valid or specious, the government cannot take further advantage of its policy of disparate enforcement by seeking to use the unavailability exception to the six months trial readiness requirement. The benign neglect of selective service fugitives is not only at odds with the due diligence requirement but also at odds with the Speedy Trial Clause of the Constitution generally, and its implementing plans. Justice Powell, writing on behalf of the majority in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972), strongly affirmed that the speedy trial principle "places the primary burden on the courts and the prosecutors to assure that cases are brought to trial."

■ One of the significant effects of the right to a speedy trial is the control it exerts on the government. The guarantee prevents oppressive conduct on the part of public officials by limiting their ability to intentionally withhold a criminal trial. *Rutherford v. State*, 486 P.2d 946, 956 (Alaska 1971) (Connor & Rabinowitz, JJ., dissenting in part). As Justice Brennan observed in his concurrence in *Dickey v. Florida*, 398 U.S. 30, 44, 90 S.Ct. 1564, 1571, 26 L.Ed.2d 26 (1970), "the guarantee protects our common interest that government prosecute, not persecute, those whom it accuses of crime."

■ When the government's failure to act expeditiously on Selective Service indictments means that those defendants must eventually go to trial without the speedy trial protections afforded other defendants, the question of selective prosecution arises. The due diligence requirement should be the same for all defendants regardless of the nature of the offense charged. Courts have not been receptive to selective prosecution claims in the past. But, attitudes are changing. Note, Reviewability of Prosecutorial Discretion: Failure to Prosecute, 75 Colum.L.Rev. 130 (1975).

Recent decisions have shown little tolerance for unequal treatment of defendants by those in charge of the criminal justice system. *See, e. g., People of The State of New York v. Acme Markets, Inc.*, 37 N.Y.2d 326, 372 N.Y.S.2d 590, 334 N.E.2d 555 (1975); *Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975). In *Lennon v. INS*, John Lennon of Beatles fame contended that the Immigration and Naturalization Service strayed from its customary practices and abused its

discretion by commencing deportation proceedings while he was seeking custody of his wife's child. The INS had not instituted deportation proceedings against aliens with criminal records far worse than Lennon's; he had been convicted in Britain for possession of marijuana. Lennon suggested that the deportation proceedings were instituted to prevent him from participating in demonstrations against the Vietnam war. Although the court characterized the selective prosecution claim as "premature," it stated that "courts will not condone selective deportation based upon secret political grounds." *Id.* at 195.

 The discrepancy between the practice of the government with respect to seeking the return of persons accused of draft refusal and persons accused of other federal felonies, may not be sufficient to support an independent claim of selective prosecution. But it prevents the government from asserting that it has proceeded with the due diligence required by the speedy trial plans.

c. Analogy to Duty of Government to Obtain Presence of Person Incarcerated in Another Jurisdiction.

The conclusion that the government did not use "due diligence" in attempting to obtain Salzmann's presence is reinforced by comparing the government's efforts in the Salzmann case with the duties the Speedy Trial Rules impose on the government in an analogous situation, i. e., when the accused is imprisoned in another jurisdiction. All three Plans impose on the government the duty to attempt to obtain the presence of a prisoner incarcerated elsewhere promptly, or if that is impossible, to take steps to notify the prisoner of the charges so that an effective demand for a speedy trial can be made. This Rule is set forth in Rule 7 of the Second Circuit Rules, Rule 9(b) of the 50(b) Plan, and 10(b) of the Interim Speedy Trial Act Plan. Rule 7 of the Second Circuit Rules reads as follows:

7. If the United States Attorney knows that a person charged with a criminal offense is serving a term of imprisonment in a federal, state or other institution or that of another jurisdiction, it is his duty promptly:

(a) to undertake to obtain the presence of the prisoner for plea and trial; or

(b) when the government is unable to obtain the presence of the defendant, to cause a detainer to be filed with the official having custody of the prisoner and request him to advise the prisoner of the detainer and to inform the prisoner of his rights under these rules.

The latter two plans contain identical language, except for the requirement that the prisoner be informed of "his rights under the Federal Rules of Criminal Procedure" in addition to rights under the rules.

Analysis of Rule 7, and in particular subsection (a) of 7, is helpful when dealing with a Rule 5(d) [6(h) of Interim Speedy Trial Plan] problem because together they clarify the basic thrust of the Rules. Each rule places the responsibility for proceeding to trial speedily on the government. And this despite situations in which the accused could be blamed as primarily responsible for any delay, either through flight or additional criminality. The due diligence requirement of 5(d)[6(h)] ensures that it is not any fault of the defendant that extends the six months delay period, but rather the fact that the government cannot produce the defendant. The duties of the government with respect to defendants incarcerated in other jurisdictions outlined in 7(a) emphasize the responsibility of the government to produce the defendant or to give the defendant the tools to make the production possible. Rule 7(a) and its subsequent counterparts forcefully destroy what was until recently the prevailing view that a defendant incarcerated elsewhere cannot demand a speedy trial since the defendant is responsible for the delay. *See* Note, The Right to a Speedy Criminal Trial, 57 Colum. L.Rev. 846, 850–51 (1957); A.B.A. Standards Relating to Speedy Trial, Commentary to 3.1(a) (Approved Draft 1968).

But even before the Speedy Trial Plans, courts had begun to take the position that

the state must use diligence to obtain an incarcerated defendant for trial. *See, e. g., Coleman v. United States,* 142 U.S.App.D.C. 402, 442 F.2d 150, 154 (1971); *Pellegrini v. Wolfe,* 225 Ark. 459, 283 S.W.2d 162 (1955); *People v. Piscitello,* 7 N.Y.2d 387, 198 N.Y. S.2d 273, 165 N.E.2d 849 (1960). And in *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1960), the Supreme Court ruled that the prosecuting jurisdiction must make a diligent effort to obtain custody of a defendant incarcerated in another jurisdiction if the defendant demands a trial. Smith was a federal prisoner who had been indicted by a Texas grand jury. The Texas authorities made no attempt to obtain his custody in order to promptly try him, despite his demand for a trial.

Cases after *Smith v. Hooey* and the Speedy Trial Plans have stressed the principle that it is the government's responsibility to provide a speedy trial for defendants incarcerated elsewhere; at the same time they have rejected any notion that this responsibility depends on whether the defendant has demanded a speedy trial. *See Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972); *Coleman v. United States,* 142 U.S.App.D.C. 402, 442 F.2d 150, 155 (1971). *See also* Rule 8, Second Circuit Rules; Rule 7, E.D.N.Y. 50(b) Plan; Rule 8, Interim Speedy Trial Act Plan. As Professor David Rudstein has observed,

> In determining whether the defendant's incarceration in another jurisdiction is a valid excuse for delay, the efforts of the prosecuting jurisdiction are determinative, not the defendant's demand for trial.

Rudstein, The Right to a Speedy Trial: *Barker v. Wingo* in the Lower Courts, 1975 U.Ill.L.F. 11, 32.

d. Exceptional Circumstances and Excusable Neglect

Since the only specific provision that may toll the six month government readiness requirement, the unavailable defendant provision, does not apply because of the government's failure to act with due diligence to obtain Salzmann's presence, the only remaining way of tolling the running of the six month period is through general provisions. One such general provision is in the list of excluded periods that also contains the exclusion due to the absence or unavailability of the defendant. The generalized section refers to exceptional circumstances. It is Rule 5(h) of the Second Circuit Rules and the 50(b) Plan, and Rule 6(h) of the Interim Speedy Trial Act Plan. Rule 5(h) of the Second Circuit Rules reads as follows:

> 5. Excluded Periods.
>
> In computing the time within which the government should be ready for trial . . . the following periods should be excluded: . . .
>
> > (h) Other periods of delay occasioned by exceptional circumstances.

The subdivision (h) exclusion in the two subsequent Plans is identical in all important respects.

It is questionable whether the government can rely on 5(h) [6(h)] since they have not brought to the court's attention any exceptional circumstances that have made it impossible or even difficult to procure Salzmann's presence, other than his "fugitive" status. To qualify as "exceptional" within the purview of 5(h)[6(h)] the circumstances may "not be something with which the Plan's drafters were familiar." *United States v. Rodriquez,* 529 F.2d 598, 600 (2d Cir. 1976). *See also United States v. Favaloro,* 493 F.2d 623 (2d Cir. 1974) (confusion in prosecutor's office not exceptional circumstances); *United States v. Rollins,* 487 F.2d 409, 413 (prosecutor's desire to finish another investigation not exceptional circumstances) and 475 F.2d 1108, 1110 (2d Cir. 1973).

Since 5(d) is specifically addressed to the fugitive problem it is apparent that the drafters had considered the issue. Nevertheless, even if the government were to suggest an exceptional circumstance not already covered by one of the enumerated exclusions, the court's inquiry is not closed. Instead, it must then proceed to balance the public's and the defendant's interest in prompt adjudication against any competing

interest served by the exception. *United States v. Rodriquez,* 529 F.2d 598, 601 (2d Cir. 1976); *United States v. Rollins,* 487 F.2d 409, 413–14 (2d Cir. 1973). A balancing process is also required by the other general exception to the six-month rule.

The 50(b) Plan and the Interim Speedy Trial Act Plan contain a general exception in their rules setting forth the government readiness requirement. This general provision permits the government to proceed to trial within ten days if the government's failure to be ready was excusable. Rule 4 of the 50(b) Plan and Rule 5 of the Interim Plan, which have been quoted in full, *supra,* begin by stating that the government must be ready for trial within six months after instituting criminal proceedings. If the government is not ready, the defendant may move for dismissal of the indictment. According to the Rules, the motion will be denied if one of the exceptions tolling the six-month period applies. The Rules then continue:

> Otherwise the court shall enter an order dismissing the indictment with prejudice unless the court finds that the government's neglect is excusable, in which event the dismissal shall not be effective if the government is ready to proceed to trial within ten days.

e. Exceptional Prejudice to Defendant

In considering whether the government should be permitted to have the delay of four years since indicting Salzmann discounted because of either exceptional circumstances or excusable neglect, the severe prejudice to Salzmann consequent to the delay must be weighed. Two significant alternatives that have been available to others accused of draft evasion are no longer available. The United States Attorney no longer has the power to exercise discretion and permit the defendant to submit to the draft in lieu of prosecution. And Salzmann may no longer participate in the Amnesty Program.

The authority of the United States Attorney to offer submission to the draft as an alternative to prosecution terminated on July 1, 1973, with the expiration of the general induction authority provided for in 17(c) of the Military Selective Service Act. 50 U.S.C.App. § 467. Prior to July of 1973, which was over a year after Salzmann had been indicted, and over three years from his alleged violation of the Selective Service Act, the government had made submission to induction a standard method of handling indictees. Henry Petersen, as Assistant Attorney General in charge of the Criminal Division, noted that it was the Justice

> Department's policy to allow a defendant, in the absence of aggravating circumstances, to remove . . . delinquency under the Military Selective Service Act by submitting to the induction process and to authorize a dismissal of his indictment upon successful completion of induction.

Memorandum to United States Attorneys, Selective Service Cases (April 27, 1973).

This Justice Department policy was so widely applied that the Department credited submission to induction for the majority of dismissals of Selective Service indictments. During the period between March 1971 and February 1972, 1,565 Selective Service defendants were convicted, 293 were acquitted, and 2,021 had their indictments dismissed. 1,365 of the indictment dismissals were due to submission to induction or performance of alternative civilian work, 36 to punitive classification, 23 because the board had no basis in fact for the classification, 285 because of irregularity in the proceedings classifying the defendant, and 312 for miscellaneous reasons. Hearings on Selective Service System Procedures and Administrative Possibilities for Amnesty Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 92d Cong., 2d Sess., at 396 (1972). These statistics indicate that 35.25% of the cases concluded involved indictments dismissed because of submission to induction.

The Eastern District of New York experience regarding submission to induction as

an alternative to prosecution was similar to the national pattern. In an affidavit submitted in conjunction with *United States v. Lockwood,* 386 F.Supp. 734 (E.D.N.Y.1975), an Eastern District selective service case, Assistant United States Attorney Maher indicated that

> From 1966 to July 1973, the vast majority of [Eastern District] defendants who were indicted on charges emanating from a failure to report for induction and who expressed a desire to comply with the induction order were permitted to do so; and if they were accepted for induction (or if rejected by the Armed Forces), their indictments were dismissed on motion by the United States.

■ There is no indication in the record that Salzmann was ever notified that the Justice Department would consider seeking dismissal of his indictment if he submitted to induction. Furthermore, because of the extensive delay in bringing Mr. Salzmann to trial, the United States Attorney can no longer present this alternative to prosecution to him. As a result, Salzmann is deprived of a choice that so many other defendants made, and he is much more likely to be burdened with a criminal record. The prejudice from the delay is substantial, since Salzmann never expressed an unwillingness to serve in the military. There is a very real possibility that he would have taken advantage of this Justice Department policy and submitted to induction if his case had been pursued vigorously.

Due to the long delay in bringing Salzmann to trial there is a second alternative to prosecution that the United States Attorney can no longer offer. On September 16, 1974, President Ford signed a proclamation announcing a program for the return of Vietnam-era draft evaders and military deserters. As he signed the proclamation he noted that

> The primary purpose of this program is the reconciliation of all our people and the restoration of the essential unity of Americans within which honest differences of opinion do not descend to angry discord, and mutual problems are not polarized by excessive passion.
>
> My sincere hope is that this is a constructive step toward a calmer and cooler appreciation of our individual rights and responsibilities and our common purpose as a Nation, whose future is always more important than its past.

Hearings on Review of Agency Practices and Procedures in the Administration of the Presidential Clemency Program Before the Subcomm. on Administrative Practices and Procedures of the Senate Comm. on the Judiciary, 93d Cong., 2d Sess., at 9 (1974). The White House estimated that there were 15,500 draft evaders eligible for the program and 500,000 deserters. Of the over 15,000 draft evaders, about 4,060 were in situations similar to Salzmann's, i. e., under indictment and listed as fugitives. White House Fact Sheet, Program for the Return of Vietnam Era Draft Evaders and Military Deserters 1 (Sept. 16, 1974), *id.* at 12. The President's Program permitted a person under indictment to present himself to the United States Attorney before January 31, 1975, a date which was later extended to March 31, 1975, if he agreed to perform a period of alternate service ranging up to two years under the auspices of the Director of Selective Service in return for dismissal of the indictment with prejudice. The Amnesty Program ended approximately five years after Salzmann failed to appear for his pre-induction physical and approximately three years after the government indicted him.

Detailed examination of the Speedy Trial Plans that have been in effect since Salzmann's indictment indicates that the government has violated Salzmann's rights under the Plans. The government failed to exercise due diligence to obtain his presence for trial. As a result, four years have passed and a prospective trial date is still not in sight. Any circumstances that the government may point to in order to excuse its neglect of this case are far outweighed by the prejudice already incurred by this defendant.

### B. Constitutional Right to Speedy Trial

In *United States v. Lockwood,* 386 F.Supp. 734 (E.D.N.Y.1975), this court rejected a blanket motion to dismiss the indictments pending against twenty-six defendants accused of violating the selective service law. Appointed counsel urged that their Sixth Amendment right to a Speedy Trial had been violated. The court granted the defendants leave to renew the motion individually, however, when facts were developed in each case that would permit the court to conduct the delicate balancing required by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The discovery conducted by defendant Salzmann now makes it possible to consider the Sixth Amendment claim.

The Sixth Amendment guarantees that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S.Const. Amend. VI. In construing this clause, the Supreme Court has emphasized its importance. *Beavers v. Haubert,* 198 U.S. 77, 25 S.Ct. 573, 49 L.Ed. 950 (1905); *Pollard v. United States,* 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); *Dickey v. Florida,* 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Not until the decision in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), however, did the Court articulate "the criteria by which the speedy trial right is to be judged." *Id.* at 516, 92 S.Ct. at 2185. In *Barker,* the Court adopted an ad hoc four part balancing test "in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. at 2192.

The four factors that must be assessed are: the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192.

The Supreme Court regarded none of these factors as decisive.

Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. *Id.* at 533, 92 S.Ct. at 2193. *See Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973).

#### 1. Length of Delay

The length of the delay in the Salzmann case is substantial even though the Sixth Amendment only applies to post-accusation delay. *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975) (Per Curiam); *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). Discussion of the more than two years that passed between the alleged crime and indictment and of the nearly seventeen months that passed between the prosecutor's receipt of the delinquent registrant report and the indictment will be reserved for the analysis of Rule 48(b) of the Federal Rules of Criminal Procedure, *infra.* Salzmann was indicted in June of 1972. Four years later he has still not been brought to trial. The length of this delay places a heavy burden of justification on the government. *See, e. g., United States v. Jones,* 524 F.2d 834, 849 (D.C. Cir. 1975); *United States v. Geelan,* 520 F.2d 585, 587 (9th Cir. 1975); *United States v. West,* 164 U.S.App.D.C. 184, 504 F.2d 253, 255–56 (1974).

#### 2. Reasons for Delay

Salzmann and the government share responsibility for this delay. There is no indication in the record that Salzmann has made any serious effort to return to the United States for trial. On the other hand, it would be a distortion to classify him a fugitive who has sought to avoid trial. Salzmann emigrated to Israel in 1969. Since his rabbinical studies in the United States guaranteed him exemption from the draft, his assertion that he "did not run away from America but went to Israel" for

positive reasons, must be accepted. During his residency in Israel he has served in the Israeli Army and applied for Israeli citizenship. Although Salzmann has not traveled to this country to meet any military obligations or to make any court appearances, he has been conscientious in informing the government of his residence and explaining why he has not appeared in the States. Time and again he has told the government that he lacks funds to travel back to the United States.

The Supreme Court has made clear in its Speedy Trial Clause cases that once a defendant is indicted, the government has a duty to act diligently to procure the accused for trial. As Justice Powell expressed it in *Barker v. Wingo*, 407 U.S. 514, 527, 92 S.Ct. 2182, 2190, 33 L.Ed.2d 101 (1972), "A defendant has no duty to bring himself to trial; the State has that duty . . . ." This duty even survives the voluntary commission of criminal acts that place the defendant in the custody of another jurisdiction. *See, e. g., Dickey v. Florida*, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *Prince v. Alabama*, 507 F.2d 693, 706 (5th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 147, 46 L.Ed.2d 108 (1975); *Hoskins v. Wainwright*, 440 F.2d 69, 71 (5th Cir. 1971), *aff'd after remand*, 472 F.2d 158 (1972), *rev'd on reh.*, 485 F.2d 1186 (1973). In those cases in which a speedy trial claim is denied because of the defendant's flight from prosecution, the courts have been careful to find that the government made diligent efforts to locate the defendant. *United States v. Weber*, 479 F.2d 331, 332–33 (8th Cir. 1973). *See also United States v. Parish*, 152 U.S. App.D.C. 72, 468 F.2d 1129, 1134–35, 1137 (1972), *cert. denied*, 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973). *Cf. Hanrahan v. United States*, 121 U.S.App.D.C. 134, 348 F.2d 363, 367 (1965). *But see United States v. Ramirez*, 524 F.2d 283, 285 (10th Cir. 1975) ("inept efforts").

As was clear from the discussion of the Speedy Trial Rules requirement that the government exert due diligence to obtain the presence of unavailable defendants, *supra*, the government has, for many reasons,

done less to procure fugitive draft evaders than other felons. But we need not reach the issue here of whether the government's failure to seek extradition has resulted in a trial delay so prejudicial to the defendant as to require dismissal. In Salzmann's case, the government's failure to respond to his claims that finances made it impossible for him to appear in court amounts to at least negligence. In light of this failure to even offer transportation to the United States to stand trial, it is hard to contend that the government has made a reasonable, good faith effort to procure Salzmann's presence. *See Strunk v. United States*, 412 U.S. 434, 436, 93 S.Ct. 2260, 2262, 37 L.Ed.2d 56 (1973); *Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *United States v. Geelan*, 520 F.2d 585, 588 (9th Cir. 1975); *United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974). *See also United States v. Roberts*, 515 F.2d 642, 647 (2d Cir. 1975) (indictment dismissed for delay due to government inactivity); *Hanrahan v. United States*, 121 U.S.App.D.C. 134, 348 F.2d 363, 368 (1965) (indictment to be dismissed if delay due to government negligence); *United States v. Reed*, 285 F.Supp. 738, 743 (D.D.C.1968) (indictment dismissed due to delay caused by government negligence). *Cf. United States v. Brown*, 172 U.S.App.D.C. 92, 520 F.2d 1106, 1108, 1109, 1113 (1975) (dismissed for what were largely institutional delays); *United States v. West*, 164 U.S.App.D.C. 184, 504 F.2d 253, 256 (1974) (same); *United States v. Fay*, 505 F.2d 1037, 1039, 1040 (1st Cir. 1974) (same); *United States v. Calloway*, 164 U.S. App.D.C. 204, 505 F.2d 311, 319 (1974) (same).

When interpreting related constitutional rights the Supreme Court has given conclusive weight to the government's failure to make a reasonable good-faith effort to obtain the presence of those residing abroad. For instance, the duty to obtain witnesses is imposed by a companion clause to the Sixth Amendment's Speedy Trial Clause, the Compulsory Process Clause. *See* Westen, Compulsory Process II, 74 Mich.L.Rev. 191, 276 (1975). The Sixth Amendment states that "In all criminal prosecutions, the ac-

cused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S.Const. Amend. VI.

█ A central problem in the enforcement of this Clause is the effort the government must exert to produce witnesses for the defense. To prevent this Clause from becoming a "dead letter," in the words of John Marshall, *United States v. Burr*, 25 F.Cas. pp. 30, 33, No. 14,692d (C.C.D.Va. 1807) (Marshall, Cir. J.), courts have held that a defendant is entitled to demand that a state make a reasonable, good-faith effort not only to serve its subpoenas, *see United States v. Bolden*, 461 F.2d 998, 1000 (8th Cir. 1972); *Maguire v. United States*, 396 F.2d 327, 330 (9th Cir. 1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969), but also to ensure compliance with them if the defendant can show some likelihood that the effort will be successful. *See, e. g., Johnson v. Johnson*, 375 F.Supp. 872, 875–76 (E.D.Mich.1974). This reasonable, good-faith effort standard has been construed to require the government to make intensive searches. *People v. Beyea*, 38 Cal. App.3d 176, 191, 113 Cal.Rptr. 254, 263 (1974); *State v. Pereda*, 111 Ariz. 344, 529 P.2d 695, 697 (1974) (insufficient to rely on telephone calls without visiting witness' residence or place of business); *Johnson v. Walker*, 199 F.Supp. 86, 95 (E.D.La.1961), *aff'd*, 317 F.2d 418 (5th Cir. 1963) (issuance of a statewide pickup order); *Commonwealth v. Blair*, 460 Pa. 31, 35, 331 A.2d 213, 214 (1975) (visits to her residence, her parents' residence plus all-night vigil outside her residence); Westen, Compulsory Process II, 74 Mich.L.Rev. 191, 276 ff. (1975). Similar efforts must be made to obtain witnesses from foreign jurisdictions. *Cf. Poe v. Turner*, 490 F.2d 329, 331–32 (10th Cir. 1974); *Williams v. Maryland*, 375 F.Supp. 745, 755–56 (D.Md.1974) (state failed to pursue leads into neighboring jurisdiction); *United States v. Singleton*, 460 F.2d 1148, 1152–53 (2d Cir. 1972).

When the government relies on information from an informer who witnessed the defendant's actions "fundamental . . .

fairness" requires the government to locate the informer so that the defendant can call the informer as a witness. *Roviaro v. United States*, 353 U.S. 53, 60, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957). The government's efforts to produce the informer must be reasonable and made in good faith. *Velarde-Villarreal v. United States*, 354 F.2d 9, 13 (9th Cir. 1965); *United States v. Clarke*, 220 F.Supp. 905, 908 (E.D.Pa.1963); *Eleazer v. Superior Ct.*, 1 Cal.3d 847, 853, 83 Cal.Rptr. 586, 590, 464 P.2d 42, 46 (1970).

When unavailability of a witness is used as a basis for admission of hearsay, the government must make reasonable good-faith efforts to confront the defendant with the witnesses against the defendant. *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968); *United States v. Lynch*, 163 U.S.App.D.C. 6, 499 F.2d 1011, 1023 (1974).

█ Under the Speedy Trial analysis outlined in *Barker*, the government's failure to exert a reasonable good-faith effort to obtain Salzmann is not conclusive. Two more factors must also be weighed. They are the defendant's assertion of his right to a Speedy Trial and the prejudice to the defendant from the delay.

### 3. Assertion of Right

█ Professor Lusky moved to dismiss Salzmann's indictment, along with those against other Selective Service defendants, on speedy trial grounds in the fall of 1974, and again in the fall of 1975, after Salzmann had requested that Professor Lusky represent him. Salzmann had not raised the speedy trial issue prior to Lusky's intervention on his behalf. Although the Supreme Court considers assertion of the right an important factor in determining whether the defendant has been deprived of the right, *Barker v. Wingo*, 407 U.S. 514, 531–32, 92 S.Ct. 2182, 2192–93, 33 L.Ed.2d 101 (1972), Salzmann's long silence does not weigh heavily against him. He was without counsel prior to his request that Lusky represent him. It is likely, therefore, that he was unaware of his right to a speedy trial or of the consequences of his failure to

demand a trial promptly. Failure to demand a speedy trial cannot be construed as a waiver unless knowingly and voluntarily made. *Id.* at 529, 92 S.Ct. at 2191. *See United States v. Holt*, 145 U.S.App.D.C. 185, 448 F.2d 1108, 1111, *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 256 (1971); *United States v. Butler*, 426 F.2d 1275, 1278 (1st Cir.), *aff'd after remand*, 434 F.2d 243 (1970), *cert. denied*, 401 U.S. 978, 91 S.Ct. 1207, 28 L.Ed.2d 328 (1971); *United States v. Reed*, 285 F.Supp. 738, 741 (D.D.C. 1968). *Cf.* Rule 8, Second Circuit Rules; Rule 7, E.D.N.Y. 50(b) Plan; Rule 8, Interim Speedy Trial Act Plan. The government's position that "where [a] defendant was aware of the pending indictment, his decision to avoid trial constitutes a waiver of his right to a speedy trial" is simply incorrect. Letter of Assistant United States Attorney Thomas R. Maher, *United States v. Salzmann*, June 10, 1976.

4. Prejudice to Defendant and Public

The final factor is the prejudice to the defendant. Salzmann and his family have endured for four years the anxiety attendant on criminal indictment, a burden that is weighty. *See Strunk v. United States*, 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973); *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971); Note, The Right to a Speedy Criminal Trial, 57 Colum.L.Rev. 846, 864 (1957). In addition, Salzmann has suffered a special prejudice. As was noted in some detail in the course of a discussion of the Speedy Trial Rules, *supra*, Salzmann cannot take advantage of two options available to other draft offenders to escape prosecution. The United States Attorney is no longer able to offer submission to induction into the Armed Forces or participation in the Amnesty program. The severity of this prejudice is obvious.

We recognize that, in comparison with the number of Sixth Amendment claims made, relatively few claims are treated favorably. The paucity of cases in which courts have granted a defendant's Sixth Amendment claim is in large part due to the harsh nature of the relief. Since a court must dismiss an indictment with prejudice if it concludes that the balance of the *Barker* factors is in the defendant's favor, *Strunk v. United States*, 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973), courts have required a significantly stronger showing by defendants than was arguably envisioned by the Supreme Court. In a candid appraisal of the situation the court in *United States v. Jones*, 524 F.2d 834, 852 (D.C. Cir. 1975), noted that

> Operating in a field where the only possible remedy is 'the draconian remedy of dismissal of the indictment,' we have been reluctant to find that an accused's right to a speedy trial has been violated absent a credible showing that he has been substantially prejudiced by the delay.

*See also United States v. Gavic*, 520 F.2d 1346, 1350 (8th Cir. 1975); *United States v. Douglas*, 164 U.S.App.D.C. 144, 504 F.2d 213, 219 n.7 (1974).

■■■ Professor Amsterdam has suggested that even the Supreme Court's opinions do not foreclose more flexibility in remedial response to Sixth Amendment claims. Amsterdam, Speedy Criminal Trial: Rights and Remedies, 27 Stan.L.Rev. 525, 535, 537 (1975). *Cf.* Speedy Trial Act, 18 U.S.C.A. § 3162(a)(1975). Due to the extensive delay, the government inaction and the substantial irreversible prejudice, however, the only appropriate remedy in this case is dismissal with prejudice.

Justice White in *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966), listed the three interests that the Sixth Amendment protects. It stands as a buffer between the defendant and extended incarceration, it helps insure a fair trial with fresh evidence and it reduces the anxiety and vulnerability a defendant experiences while under indictment. The loss of the chance to escape the heavy burden of a felony conviction is the type of prejudice against which the Constitutional right to a speedy trial was designed to protect a defendant. In effect, the long delay, to which the government contributed in no small measure, has destroyed

Salzmann's ability to emerge as unscathed from his confrontation with the criminal process as other draft offenders. Such an impairment to the fairness of the criminal proceedings requires dismissal with prejudice. *Strunk v. United States,* 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973). *Cf. Dickey v. Florida,* 398 U.S. 30, 38, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970). Remedies that might be suitable cures for the infringement of the defendant's right to a speedy trial in other circumstances, such as dismissal without prejudice, or expediting the trial, are ineffectual in righting the wrong suffered by Salzmann.

■■■ In two significant Sixth Amendment cases the Supreme Court made clear that it is not necessary to find that the prejudice to a defendant was the result of purposeful government activity to dismiss with prejudice. *Strunk v. United States,* 412 U.S. 434, 436–37, 93 S.Ct. 2260, 2262, 37 L.Ed.2d 56 (1973); *Barker v. Wingo,* 407 U.S. 514, 531, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972) (dictum). While the court was discussing the prejudice to defendants' ability to defend themselves in *Barker,* the prejudice to defendants' ability to escape prosecution altogether must certainly be as important. In both instances, what is protected is a citizen's right to interact with the criminal justice system in such a way that the citizen can avoid any criminal record and the punishment and disabilities that a judgment of guilt entails.

■■■ Reduction of criminal penalties was precisely the type of prejudice that influenced the court in *Smith v. Hooey,* 393 U.S. 374, 378, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), to dismiss the indictment on Sixth Amendment grounds. In *Smith* the government's failure to procure the defendant's presence for trial while he was incarcerated in another jurisdiction meant that he "forever lost" the opportunity to have concurrent sentences and thus avoid additional incarceration on the second offense. *Id. See also Prince v. Alabama,* 507 F.2d 693, 707 (5th Cir.), *cert. denied,* 423 U.S. 876, 96 S.Ct. 147, 46 L.Ed.2d 108 (1975); *United States v. Geelan,* 520 F.2d 585, 589 (9th Cir. 1975);

*United States v. Rucker,* 150 U.S.App.D.C. 314, 464 F.2d 823, 826 (1972); *Coleman v. United States,* 142 U.S.App.D.C. 402, 442 F.2d 150, 154 (1971). *But see United States v. Ramirez,* 524 F.2d 283, 285 (10th Cir. 1975). Of course, government inaction or negligence operates to increase the presumption of prejudice. *Murray v. Wainwright,* 450 F.2d 465, 471 (5th Cir. 1971).

Permitting the delay in the Salzmann case injures not only the interests of the defendant but also the public interest. The Second Circuit has stated that the Plans for Achieving Prompt Disposition of Criminal Cases, insofar as they promote prompt adjudication of criminal cases, serve the public even more than defendants. *United States v. Yagid,* 528 F.2d 962 (2d Cir. 1976); *United States v. Roemer,* 514 F.2d 1377, 1381 (2d Cir. 1975); *United States v. Flores,* 501 F.2d 1356, 1360 n.4 (2d Cir. 1974) (Per Curiam); *United States v. Rollins,* 487 F.2d 409 (2d Cir. 1973). As was pointed out in the review of the history of the Rules, from the very beginning the Rules' drafters viewed them as vehicles to serve both the public and the defendant. The sensitivity to the service Speedy Trial Rules perform for the public is only natural since courts have long been aware that the constitutional right to a speedy trial is vital to the protection of the public. *See, e. g., Barker v. Wingo,* 407 U.S. 514, 519, 92 S.Ct. 2182, 2186, 33 L.Ed.2d 101 (1972).

■■■ Justice Brennan enumerated three ways in which the public is harmed by delayed trials: the impairment of the ability to convict, the danger of repeated criminality and the weakening of deterrence.

The Speedy Trial Clause protects societal interests, as well as those of the accused. The public is concerned with the effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. Just as delay may impair the ability of the accused to defend himself, so it may reduce the capacity of the government to prove its case. Moreover, while awaiting trial, an accused who is at large may become a fugitive from justice or commit other

criminal acts. And the greater the lapse of time between commission of an offense and the conviction of the offender, the less the deterrent value of his conviction.

*Dickey v. Florida,* 398 U.S. 30, 42, 90 S.Ct. 1564, 1571, 26 L.Ed.2d 26 (1970) (concurring).

The first two points made by Justice Brennan may have less impact in draft cases. The heavy reliance in draft cases on documentary evidence in the possession of the government means that the capacity of the government to prove its case may not be as seriously hampered in the Salzmann prosecution as in some other criminal prosecutions. *United States v. Lavin,* 480 F.2d 657 (2d Cir. 1973); *United States v. Dyson,* 469 F.2d 735, 740 (5th Cir. 1972); *United States v. Golon,* 378 F.Supp. 516, 520 (D. Mass. 1974), *rev'd on other grounds,* 511 F.2d 298 (1st Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *United States v. Daneals,* 370 F.Supp. 1289, 1300 (W.D.N.Y.1974). Similarly, due to the unique nature of the offense and the likelihood of flight, draft evaders are less likely to commit other crimes before they are tried than most other criminals. Many of those who avoided military service did so for political reasons rather than from any inclination toward criminality.

On the other hand, the deterrence value of prosecution is much more seriously impaired by delay in a draft case than in most criminal prosecutions. The inordinate delays in Selective Service cases, contrary to the express command of Section 462 of Title 50 of the United States Code Appendix may explain why there are presently so few convictions and sentences are so light. In 1975, of a total 1,376 dispositions, 1,147 were not convicted; only 56 were convicted after trial and only 20 jail terms were imposed. 1976 Semi-Annual Report of the Director of the Administrative Office of the United States Court 38.

The end not only of the Vietnam conflict, but also of the draft has made any deterrent value from the prosecution of draft evaders highly speculative. It may be that the draft will be reinstituted, but the prospect of that in the near future is slight. The proper question from the standpoint of deterrence is whether the dismissal of indictments from the Vietnam period for failure to prosecute promptly will encourage evasion of any future draft laws. It seems likely that the prosecution policy of each conflict, whether it is prompt or dilatory, will have a more significant effect on deterrence than the indictment dismissal rate during previous wars. But, any deterrence value that does transfer to some possible future conflict will be enhanced by making it clear that the government must prosecute swiftly wherever possible.

As far as specific deterrence is concerned, prosecution at this time is unlikely to have any socially beneficial effect on Salzmann. Rather, all the socially beneficial effects would have stemmed from government compliance with the speedy trial principle. If the government had responded promptly to Salzmann's dilemma, prosecution might have been avoided altogether. Mr. Salzmann indicated no aversion generally to fighting and did not settle abroad in order to escape draft obligations. If the government had proceeded expeditiously, Mr. Salzmann might have chosen to submit to induction. If his presence had been obtained promptly, as the record indicates may have been possible with a minimum of government effort, then the anxiety suffered by Salzmann and his family and the burden of this prosecution to the court and prosecutor might have been avoided altogether.

A final public interest should be mentioned. President Ford has spoken of the importance of the "reconciliation of all our people" and of the fact that our Nation's "future is always more important than its past." For the government to continue to press the prosecution of Salzmann now, long after the war, when it failed to respond at all, much less intelligently, to his correspondence at a time when response might have benefited the country by obtaining another member for the Armed Forces and might have avoided the severe

prejudice now suffered by Salzmann is highly inequitable and thoroughly at odds with the speedy trial principle.

### C. Federal Rules of Criminal Procedure 48(b)

▮ Authority exists in addition to the Speedy Trial Rules and the Sixth Amendment to justify dismissal of the present indictment for unwarranted delay by the government in its prosecution of defendant Salzmann. The inherent residual power derived from common law of a court to control its own dockets enables courts to dismiss cases for failure to prosecute. *United States v. Furey*, 514 F.2d 1098, 1103 (2d Cir. 1975); *Mann v. United States*, 113 U.S.App. D.C. 27, 304 F.2d 394, 398, *cert. denied*, 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962); *Ex Parte Altman*, 34 F.Supp. 106, 108 (S.D. Cal. 1940). This power was specifically restated in Rule 48(b) of the Federal Rules of Criminal Procedure and provides the court with authority independent of Sixth Amendment and Speedy Trial Rules considerations. *See* Advisory Committee Notes to Rule 48, 8A Moore's Federal Practice ¶ 48.-01. Rule 48(b) states:

> *(b) By Court.* If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

#### 1. When 48(b) Applies

There are three periods of delay that may be relevant to Rule 48(b). The first is the one and one-third years between the local board's filing of a delinquent status report with the United States Attorney and the indictment. Salzmann was ordered to report for pre-induction processing on May 27, 1970, and for induction on January 18, 1971; he obeyed neither order. On February 3, 1971, the local board notified the United States Attorney's office of his delinquent status. In June of 1972, the government indicted defendant for his failure to report.

The second period is the two and one-quarter years between indictment and the first motions made on Salzmann's behalf. Twelve days after the indictment was filed on June 26, 1972, a bench warrant was issued. Thereafter the case lay dormant for over two years until this court, in September of 1974, in an attempt to expedite the many outstanding selective service cases on its docket, appointed Professor Lusky attorney for Salzmann and twenty-six other defendants.

The final period, lasting approximately two years, is the time during which this case has been actively before this court and on appeal. From September 1974 to the present, this court has heard motions, including the present motion to dismiss.

Prior to 1971, there was no agreement as to the point at which the 48(b) right attaches to the defendant. Some courts had previously held that a defendant could rely on 48(b) as authority for dismissal of an indictment when there was unnecessary delay preceding the institution of any criminal proceedings. *See, e. g., United States v. Jasper*, 331 F.Supp. 814, 818–19 (E.D.Pa. 1971), *vacated*, 460 F.2d 1224 (3d Cir. 1972) (vacated after *United States v. Marion*). The Supreme Court, however refused to adopt this construction of 48(b). In *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971) (dicta), the Court ruled that the right under Rule 48(b), like the Sixth Amendment right, attaches only after the defendant has been formally accused, either through arrest or the filing of an indictment or information. Although the decision rested exclusively on constitutional grounds, the Supreme Court reached out to resolve the question of the time at which the 48(b) right becomes effective.

Its refusal to extend either the Sixth Amendment right to a speedy trial or Rule 48(b) statutory guarantees to pre-accusation delay was bottomed on the fact that the "major evils protected against by the speedy trial guarantee" come into existence, at the earliest, at the arrest or indictment of the person:

Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. . . . So viewed, it is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment.

404 U.S. at 320, 92 S.Ct. at 463.

Despite the fact that the *Marion* interpretation of 48(b) is dicta, recent cases have supported its reading of the time at which 48(b) attaches. *See, e. g., United States v. Giacalone,* 477 F.2d 1273, 1275 (6th Cir. 1973) (pre-indictment delay only considered in the context of the defendant's Fifth Amendment due process rights); *United States v. Iannelli,* 461 F.2d 483, 485 (2d Cir. 1972), *cert. denied,* 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972) (same); *United States v. White,* 470 F.2d 170, 174 (7th Cir. 1972) (same).

■ Under this interpretation, then, Salzmann's rights under 48(b) attached, at the latest, at the second of the three above-mentioned stages; he can point to a delay of at least two and one quarter years from his indictment to this court's order of September 1974. There exists ample authority, however, which would enable defendant Salzmann to complain not only of the second, but also the first of the three periods of delay, the one and one third years from the time of the local board's referral of the case for prosecution to the filing of an indictment. Entirely consistent with the *Marion* decision, this authority depends on the special nature of selective service cases in order to apply a more stringent standard of expeditiousness to the government.

All prosecutions of selective service cases are subject to a special statute mandating expeditious prosecution. The Selective Service Act of 1967 provides:

The Department of Justice shall proceed as expeditiously as possible with a prosecution under this section, or with an appeal, upon the request of the Director of the Selective Service System or shall advise the House of Representatives and the Senate in writing the reasons for its failure to do so.

50 U.S.C.App. § 462(c). Of relevance to the instant case is the legislative history of this section which indicates that:

[the] committee believes that enactment of this provision will create a sense of urgency in the Department of Justice in respect to violations of the Selective Service Act.

1967 U.S.Code Cong. & Admin.News 1967, p. 1333. Moreover, 50 U.S.C. App. 462(a) adds the requirement that

[precedence] shall be given by courts to the trial of cases arising under this title, and such cases shall be advanced on the docket for immediate hearing.

Courts faced with prosecutions under this title have responded to these statutory requirements by measuring the time of delay not from the point of indictment, but from the time that the United States Attorney was notified of the potential violation. *See United States v. Dyson,* 469 F.2d 735, 741 (5th Cir. 1972); *United States v. Daneals,* 370 F.Supp. 1289, 1299–1300 (W.D.N.Y. 1974).

■ In deciding, therefore, whether to dismiss defendant's indictment under Rule 48(b), this court is not limited to delay from indictment to the present. The Congressional mandate for speedy prosecution under the Selective Service Act of 1967 justifies examination of the delay between the February 1971 referral to the government and the filing of an indictment.

B. Unnecessary Delay

■ The 48(b) right is not only broader than the Sixth Amendment right in that it may attach before a person is accused but also in that once brought to bear Rule 48(b) provides significantly stricter standards by which this court must judge the govern-

ment's efforts to bring defendant Salzmann to trial.

■ That 48(b) requires dismissal when there has been a violation of a defendant's right to a speedy trial has long been clear. *Pollard v. United States*, 352 U.S. 354, 361 n. 7, 77 S.Ct. 481, 486, 1 L.Ed.2d 393 (1957); *United States v. Ward*, 240 F.Supp. 659, 660 (W.D.Wis.1965); *United States v. Palermo*, 27 F.R.D. 393, 394 (S.D.N.Y.1961). Yet Rule 48(b) does more than implement constitutional guarantees:

> it is designed also to protect other compelling public interests—not necessarily of constitutional proportions—in the prosecution of those accused of crime without the procrastination of which the processes of law are sometimes guilty.

*United States v. Mark II Electronics*, 283 F.Supp. 280, 283 (E.D.La.1968) and 305 F.Supp. 1280, 1287 (1969). *See also United States v. Clay*, 481 F.2d 133, 135 (7th Cir.), *cert. denied*, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 247 (1973); *United States v. DeLeo*, 422 F.2d 487, 495 (1st Cir.), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *United States v. Cartano*, 420 F.2d 362, 363 (1st Cir.), *cert. denied*, 397 U.S. 1054, 90 S.Ct. 1398, 25 L.Ed.2d 671 (1970); *Mathies v. United States*, 126 U.S.App.D.C. 98, 374 F.2d 312, 314–15 (1967) (Rule 48(b) "places a stricter requirement of speed on the prosecution, and permits dismissal of an indictment even though there has been no constitutional violation"); *Mann v. United States*, 113 U.S.App.D.C. 27, 304 F.2d 394, 398, *cert. denied*, 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127 (1962).

Finally, when the Second Circuit faced the question of the relationship between Rule 48(b) and the Second Circuit Rules Regarding Prompt Disposition of Criminal Cases, it recognized an important interaction between the two. In *Hilbert v. Dooling*, 476 F.2d 355, 360–61 (2d Cir.) (en banc), *cert. denied*, 414 U.S. 878, 94 S.Ct. 56, 38 L.Ed.2d 123 (1973), it analyzed the way Second Circuit Rule 4 and F.R.Cr.P. 48(b) dealt with the same general subject matter, finding no inconsistency between the two. The Court of Appeals declared:

> Our Speedy Trial Rules merely flesh out the skeleton of Rule 48, giving content to the sweeping phrase "unnecessary delay" by substituting a more precise, albeit still flexible, six-month rule.

*Id.* at 361.

■ Because Rule 48(b) empowers this court to dismiss an indictment under a standard even more exacting than the Sixth Amendment requirement of prosecutorial speed, and because it incorporates the Second Circuit Rules within its definition of "unnecessary delay," this court is obliged to re-examine all of the factors mentioned previously in the discussion of the Rules and the Speedy Trial Clause. It must weigh Salzmann's notification to the government of his financial plight, the government's failure to respond despite the existence of readily available travel assistance, the long delay since indictment, and the prejudice from the end of induction and the amnesty program.

The delay in trying Salzmann promptly prejudiced him in yet another way. If he had been tried anytime within the two and a half years following his alleged violation of the law, or within the nearly two years following the notification of the United States Attorney of the violation, or within six months after the indictment, he would have been eligible for the special sentencing provisions for those under age twenty-six.

Section 4209 of title 18 of the United States Code permits a court to sentence a defendant under the age of twenty-six under the Federal Youth Corrections Act. As a result, Salzmann may have obtained a certificate setting aside the conviction and erasing any record of it. 18 U.S.C. § 5021. *See United States v. Roberts*, 515 F.2d 642, 644 (2d Cir. 1975); *United States v. Daneals*, 370 F.Supp. 1289, 1300 (W.D.N.Y. 1974). On December 10, 1972, Salzmann's twenty-sixth birthday, these special advantages were lost to him forever. Even if these factors do not assume constitutional proportions, they buttress a finding of "unnecessary delay" within the meaning of Rule 48(b).

A Rule 48(b) dismissal is particularly warranted when the "unnecessary delay" language is read in the light of the Selective Service Act's mandate of expeditious prosecution. The court reasoned in *United States v. Dyson*, 469 F.2d 735, 738 (5th Cir. 1972), that 50 U.S.C.App. § 462 "requires defendants . . . to be brought to trial at a pace faster than speedy," thus placing a heavy burden of justification on the government. In *Dyson* there was an eight month pre-indictment and two year post-indictment delay. *See also, e. g., United States v. Daneals*, 370 F.Supp. 1289, 1300 (W.D.N.Y.1974) (20-month pre-indictment delay); *United States v. Rutkowski*, 337 F.Supp. 340 (E.D.Pa.1971) (five year pre-indictment delay).

The government has failed to sustain its burden with respect to defendant Salzmann for many of the same reasons previously mentioned in the discussion of the Speedy Trial Rules and Constitutional rights. In addition, Selective Service cases are generally simple and unsophisticated, *United States v. Dyson*, 469 F.2d 735, 740 (5th Cir. 1972); *United States v. Daneals*, 370 F.Supp. 1289, 1300 (W.D.N.Y.1974); *United States v. Rutkowski*, 337 F.Supp. 340, 342 (E.D.Pa.1971), thus increasing the need for a close analysis of the reasons for delay.

■ It is settled that a Rule 48(b) dismissal is within the sound discretion of the trial judge. *United States v. DeLeo*, 422 F.2d 487, 495 (1st Cir.), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *United States v. Research Foundation, Inc.*, 155 F.Supp. 650, 654 (S.D.N.Y. 1957). For the reasons delineated above, this court is not satisfied that the government has sustained its burden of promptness in prosecuting this defendant. As grounds for dismissal in addition to the constitutional violations discussed above, the court exercises its discretion and dismisses this case under Rule 48(b) of the Federal Rules of Criminal Procedure.

D. 50 U.S.C.App. § 462

■ Authority exists that section 462 of title 50 of the United States Code Appendix is an independent ground for dismissal. These cases are referred to in the discussion of the constitutional right to a speedy trial and of Rule 48(b), *supra*. Since section 462(c) affirmatively commands prosecution "as expeditiously as possible," it constitutes a standard stricter than the Rule 48(b) "unnecessary delay" requirement. *See, e. g., United States v. Dyson*, 469 F.2d 735 (5th Cir. 1972). Dismissal under section 462 is required.

## CONCLUSION

Defendant, a permanent resident of a foreign state, did not return to the United States when ordered to do so for a pre-induction physical or for induction. The government indicted him for a violation of the Selective Service laws. It made no attempt to procure his presence for trial or even to furnish him with transportation back to this country.

Based on the government's failure to make a reasonable effort to bring him to trial, defendant has moved to dismiss the indictment. Speedy Trial Rules in effect during the period of indictment, specifically the 1971 Second Circuit Rules and Rules adopted pursuant to the Federal Rules of Criminal Procedure, Rule 50(b), and the Speedy Trial Act of 1974, all require dismissal for the government's failure to exert "due diligence." In addition, the government's neglect of the case violates the Speedy Trial Clause of the Sixth Amendment, Federal Rules of Criminal Procedure, Rule 48(b), and section 462 of title 50 of the United States Code Appendix.

The severe prejudice suffered by the defendant is irreversible. The court has no alternative but dismissal. The action is dismissed with prejudice.

So ordered.